UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

USM HOLDINGS INC.,

           Plaintiff,

                                CASE NO. 15-14251
     v.                           HONORABLE GEORGE CARAM STEEH

BRIAN A. SIMON, et al.,

           Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS (DOC. 16), GRANTING PLAINTIFF
LEAVE TO AMEND THE COMPLAINT, AND GIVING NOTICE THAT THE COURT
WILL  DISMISS THE REMAINING STATE-LAW CLAIMS WITHOUT PREJUDICE
IF PLAINTIFF FAILS TO AMEND THE COMPLAINT TO STATE A FEDERAL CLAIM**

This securities-fraud action arises out of Plaintiff's purchase of U.S.

Manufacturing Company ("USM") in mid-2014.  Plaintiff is suing former officers,

directors, and shareholders of USM for alleged federal and state securities violations,

common-law fraud and misrepresentation, and breach of contract.  Most of the

allegations in the complaint concern defendants Brian Simon ("Simon") and Mark Roll

("Roll"), the former CEO and CFO, respectively.  The complaint divides the remaining

defendants into several groups: the pre-sale "Voting Shareholders," the pre-sale "Non-

Voting Shareholders," the "Sellers" (comprising the Voting and Non-Voting

Shareholders), and the "Simon Directors," the pre-sale directors of USM (who are all

apparently related to Simon).  Simon, but not Roll, is a member of the Voting

Shareholders, the Sellers, and the Simon Directors.  Defendants have moved to dismiss

-1-

the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 16).  The Court held a hearing on the motion on July 19, 2016.  For the reasons stated below, the Court will grant the motion in part and deny the motion in part, dismissing Counts 1 through 11, but allowing Counts 12 through 16 to proceed.  The Court will allow Plaintiff an opportunity to amend its complaint.  Plaintiff's failure to amend by the deadline will result in dismissal without prejudice of the remaining state-law claims.

### I. Background

USM is an automotive manufacturer specializing in "drive line components and assemblies, including highly specialized axle housings."  (Compl., Doc. 1, ¶ 41).  In late 2013, Sellers began marketing USM for sale.  (*Id.* ¶ 42).  Sellers provided Plaintiff with information about USM's financial status and customer relationships, and in May 2014 Plaintiff agreed to purchase USM for $270 million.  (*Id.* ¶¶ 43-45).

The sale agreement was memorialized in an Agreement and Plan of Merger ("Merger Agreement"), Doc. 1-2, signed by Plaintiff, the Voting Shareholders (including Simon), and two representatives for the Non-Voting Shareholders.  The Merger Agreement contains a number of representations and warranties concerning USM. When the sale closed in June 2014, Simon and Roll executed a Closing Certificate. (Compl. ¶ 68; Closing Certificate, Doc. 17-6).  The Closing Certificate certifies that "[t]he representations and warranties . . . contained in the [Merger] Agreement are true and correct in all material respects on and as of the Closing Date."  (Closing Certificate). Simon and Roll remained in their positions as CEO and CFO, respectively, for several months following the closing.  (*See* Compl. ¶ 113).

Plaintiff claims that after the closing, it discovered that it had been the victim of a "brazen fraud."  (Compl. ¶ 1).  Specifically, Plaintiff alleges that the Merger Agreement contained various misrepresentations and misleading omissions and that Simon and Roll made additional misrepresentations and omissions during the due-diligence phase of the sale.  The specifics will be set forth in detail in the discussion below, but, in brief, the alleged misrepresentations and omissions involve four general subjects: (1)  USM's finances, (2) the state of USM's manufacturing capital, (3) USM's relationship with its second largest customer, Dana Holding Corporation ("Dana"), and (4) USM's relationship with its largest customer, American Axle & Manufacturing ("AAM").  Plaintiff claims that as a result of the alleged misrepresentations and omissions, it overpaid for USM by at least $51 million.  (*Id.* ¶ 7).

## II. Legal Standards

### A.    Rule 12(b)(6)

A court confronted with a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether the plaintiff's factual allegations present plausible claims.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007).  "[N]aked assertions devoid of further factual enhancement" and "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are insufficient to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint need not contain "detailed" factual allegations, but its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all

of the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

### B.    Rule 9(b)

For a claim involving fraud, it is not sufficient for a plaintiff to plead general facts that render the claim plausible.  Rather, "a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  This means that a plaintiff must "allege the time, place, and content of the alleged misrepresentations [or omissions] on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."  *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003)) (internal quotation marks omitted); *see also Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255-56 (6th Cir. 2012).

### C.    PSLRA

In addition to Rule 9(b), the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, imposes heightened pleading requirements on a plaintiff alleging a violation of the Securities Exchange Act.  Under the PSLRA, a plaintiff alleging federal securities fraud must "specify [1] each statement alleged to have been misleading, [2] the reason or reasons why the statement is misleading, and [3] if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Furthermore, "the complaint shall . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  *Id.* § 78u-

-4-

4(b)(2) (emphasis added).  Under the "strong inference" standard, "a court must

compare th[e] inference [of scienter] with other competing possibilities, allowing the

complaint to go forward 'only if a reasonable person *would* deem the inference of

scienter cogent and *at least as compelling as any opposing inference* one could draw

from the facts alleged.'"  *In re Omnicare, Inc. Sec. Litig.* (*Omnicare I*), 769 F.3d 455, 473

(6th Cir. 2014) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-

24 (2007)) (citations omitted) (emphases added).

## III. Discussion

### A.    Consideration of Documents Not Attached to the Complaint

Before the Court can address the substantive arguments in Defendants' motion

to dismiss, the Court must decide a preliminary issue raised by the parties.  Plaintiff

attached only two documents to its complaint: (1) the Merger Agreement (without any of

the exhibits or schedules) and (2) Amendment No. 1 to the Agreement and Plan of

Merger ("Amendment No. 1"), Doc. 1-3.   Defendants attached a number of additional

documents to their motion to dismiss, and Plaintiff opposes the Court's consideration of

these documents.  These documents include the Schedules to the Merger Agreement

("Schedules"), Doc. 17-2; a slide-show presentation from March 2014 (the

"Management Presentation"), Doc. 17-3; a February 2014 "Confidential Information

Memorandum," Doc. 17-4; the Closing Certificate, Doc. 17-6; a "Capital Expenditure

Budget," Doc. 30-1, that was an addendum to the Merger Agreement; and a letter from

Dana to USM ("Dana Letter"), Doc. 30-2, complaining of an alleged breach of contract,

The Court will consider all of Defendants' documents.  At the Rule 12(b)(6) stage,

a court may consider documents that are not attached to the complaint only if the

documents are "part of the pleadings." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).  A document is part of the pleadings if it is (1) "referred to in the plaintiff's complaint" and (2) "central to [the plaintiff's] claim."  *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)) (internal quotation marks omitted); *see also Omnicare I*, 769 F.3d at 466.  All of Defendants' documents are referenced or quoted in Plaintiff's complaint, sometimes even multiple times. Furthermore, all of the documents are central to Plaintiff's claims.  Two of the documents—the Schedules and the Capital Expenditure Budget—are part of the Merger Agreement, the central document in this case.  The Closing Certificate is a critical document, given that this case arose out of the *sale* of USM.  Defendants Simon and Roll's alleged concealment of the breach described in the Dana Letter is one of the key factual bases for Plaintiff's claims, so the Dana Letter is central.  Finally, the Management Presentation and Confidential Information Memorandum are central because they were quoted repeatedly and because they "provide [the] backdrop for Defendants' later fraudulent statements and provide . . . evidence of scienter."  (Pl.'s Resp., Doc. 28, at 15[1]).

Thus, the Court will consider Defendants' documents.  Ultimately, however, the Court's consideration of these documents does not have a dispositive effect.

## B.    Count 1 – Section 10(b) of the Securities Exchange Act

Plaintiff's first count, against defendants Simon and Roll, alleges securities fraud under Section 10(b) of the Securities and Exchange Act and SEC Rule 10b-5.  *See* 15

---

[1] All page citations reference the ECF-generated page numbers.

U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  Plaintiff alleges that Simon and Roll "made a series of material misrepresentations and omissions to [Plaintiff] on behalf of or acting for USM." (Compl. ¶ 149).  These misrepresentations and omissions involve information about (1) USM's finances, (2) the state of USM's manufacturing capital, (3) USM's relationship with Dana, and (4) USM's relationship with AAM.

The heightened pleading standards of both Rule 9(b) and the PSLRA apply to a claim under section 10(b).  The Supreme Court has set forth the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  Defendants only challenge elements 1, 2, and 6.

> 1.      **Relevant Elements of a Section 10(b) / Rule 10b-5 Claim**
>
> a.      **Material Misrepresentation or Omission**

The first element of a section 10(b) or Rule 10b-5 claim is "a material misrepresentation or omission by the defendant." *Stoneridge*, 552 U.S. at 157.  A plaintiff must allege "(1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *Omnicare I*, 769 F.3d at 470.

The Sixth Circuit has divided misrepresentations into two categories: those that concern "hard information" and those that concern "soft information." *Omnicare I*, 769 F.3d at 470.  "Hard information 'is typically historical or other factual information that is

objectively verifiable.'" *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401-02 (6th Cir. 1997) (quoting *Garcia v. Cordova*, 930 F.2d 826, 830 (10th Cir. 1991)). Soft information "includes predictions and matters of opinion." *Sofamor Danek*, 123 F.3d at 401; *see also Helwig v. Vencor, Inc.*, 251 F.3d 540, 559 (6th Cir. 2001), *overruled on unrelated grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ("This type of information is defined only by its uncertainty: predictions, matters of opinion, and asset appraisals have all been regarded in this Circuit as 'soft.'"). Misrepresentations can concern either type of information, but misrepresentations that concern soft information must satisfy a heightened scienter requirement: knowledge, rather than mere recklessness. *Omnicare I*, 769 F.3d at 470. This heightened scienter requirement will be explained in the following section.

The Supreme Court recently held that statements of opinion (one form of soft information) are generally not actionable. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund* (*Omnicare II*), 135 S. Ct. 1318, 1326 (2015). An opinion *is* actionable, however, if the person stating the opinion does not "actually hold[] the stated belief" or if the opinion contains a materially false "embedded statement[] of fact." *Id.* at 1326-27. An opinion statements may also become actionable if it is paired with a sufficiently material omission. An opinion statement does not become actionable merely because the speaker "knows, but fails to disclose, some fact cutting the other way." *Id.* at 1329. But if the speaker "omits material facts about the . . . inquiry into or knowledge concerning [the] statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," then that omission is actionable. *Id.*

-8-

The PSLRA's "safe harbor" for "forward-looking" statements also renders certain misrepresentations not actionable.  15 U.S.C. § 78u-5(c).  A forward-looking statement is not actionable if (1) the statement was "identified as a forward-looking statement, and [was] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" *or* (2) was not made "with actual knowledge . . . that the statement was false or misleading."  *Id.* § 78u-5(c)(1).  Some examples of forward-looking statements are projections, predictions, and statements of plans or objectives.  *See id.* § 78u-5(i)(1).

Omissions are actionable only if the defendant had a duty to disclose the omitted information.  *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).  One situation in which a duty to disclose arises is when there has been "an inaccurate, incomplete or misleading prior disclosure."  *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (quoting *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n.10 (3d Cir. 2004)) (internal quotation marks omitted).  Generally speaking, there is no duty to disclose soft information unless it is "virtually as certain as hard fact."  *Helwig*, 251 F.3d at 559 (quoting *Sofamor Danek*, 123 F.3d at 402) (internal quotation marks omitted); *see also Omnicare I*, 769 F.3d at 471.

A representation or omission must not only be false or misleading, but it must also concern a "material" fact.  "Misrepresented or omitted facts are material only if [there is a substantial likelihood that] a *reasonable* investor *would* have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'"  *Sofamor Danek*, 123 F.3d at 400 (quoting *Basic, Inc. v. Levinson*, 485

-9-

U.S. 224, 232 (1988)) (emphases added).  Vague statements and "statements that are

'mere puffing' or 'corporate optimism'" are immaterial, because a reasonable investor

would not rely upon them.  *Ford Motor Co. Sec. Litig.*, 381 F.3d at 570 (quoting

*Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).  A misrepresentation

or omission may also involve "such insignificant data that, in the total mix of information,

it simply would not matter to a reasonable investor."  *Parnes v. Gateway 2000, Inc.*, 122

F.3d 539, 547 (8th Cir. 1997).

### b.    Scienter

The second element of a section 10(b) claim is scienter.  In order to satisfy this

element, the defendant must have acted with at least recklessness in making the

misleading representation or omission.  *Omnicare I*, 769 F.3d at 472.  Such

"recklessness [is] highly unreasonable conduct which is an extreme departure from the

standards of ordinary care.  While the danger need not be known, it must at least be so

obvious that any reasonable [person] would have known of it."  *In re Comshare Inc.*

*Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999) (en banc) (quoting *Mansbach v. Prescott,*

*Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)) (internal quotation marks omitted)

(first alteration in original).  Although proof of recklessness is ordinarily sufficient to

satisfy the scienter element, a plaintiff must prove a higher level of scienter if a plaintiff

accuses a defendant of misrepresenting or omitting *soft* information or if the

misrepresentation or omission was forward-looking.  In these situations, the plaintiff

must "plead facts showing that the defendant[] *knowingly* misrepresented or omitted

facts[,] to deceive, manipulate, or defraud . . . ."  *Omnicare I*, 769 F.3d at 472 (emphasis

added).

-10-

c.      **Loss Causation**

A plaintiff establishes loss causation by pleading facts that tend to show a

"causal connection between the material misrepresentation [or omission] and the loss."

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Loss causation "has been

likened to proximate cause in tort law."  *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d

901, 920 (6th Cir. 2007) (citing *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 213

(2d Cir. 2000)).  A plaintiff cannot establish loss causation if some other intervening

cause is responsible for the loss.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563

U.S. 804, 813 (2011).

2.      **Application**

a.      **Alleged Misrepresentations in Financial Statements**

Plaintiff claims that Simon and Roll misrepresented USM's finances.  Because

Defendants do not seriously contest it, the Court will assume for the sake of argument

that the disclosures, representations, and omissions in the Merger Agreement are

attributable to Simon and Roll.[2]  The Merger Agreement contains the following

representations: "[T]he Financial Statements and the Pre-Closing Balance Sheet

[provided in Schedule 2.7(a)] are in accordance with the books and records of the USM

Companies and have been prepared in accordance with [Generally Accepted

Accounting Principles or 'GAAP'] consistently applied throughout the periods covered

thereby.  The Financial Statements and the Pre-Closing Balance Sheet fairly present in

_____

[2] Counsel for Simon and Roll questioned this assumption, in passing, during the
hearing on this motion, but the Defendants' motion does not directly address the issue.
Simon signed the Merger Agreement, and both Simon and Roll ratified the
representations in the Merger Agreement when they signed the Closing Certificate.

all material respects the financial position, results of operations, stockholders' equity and cash flow" of USM. (Merger Agreement § 2.7 & App'x A-1; Compl. ¶ 142). Other sections of the Merger Agreement also make representations about USM's finances. (*See* Merger Agreement §§ 2.8, 2.10; Compl. ¶ 143). According to Plaintiff, the financial documents provided in Schedule 2.7(a) overstated USM's inventory by $883,000, understated USM's accrued liabilities by $537,000, "unexplainably included debit balances in [USM's] accounts payable," resulting in a $743,000 understatement in accounts payable, and overstated USM's working capital by $1,488,590. (Compl. ¶¶ 137-145). Plaintiff claims that these misstatements were in violation of GAAP, although Plaintiff does not identify specific GAAP rules.[3]

The alleged financial misrepresentations are not actionable for two reasons. First, Plaintiff has failed to allege facts showing that the misrepresentations were material. The alleged financial inaccuracies total less than $4 million—less than 2% of USM's $270 million purchase price or USM's $300 million[4] in annual net sales. Numerous courts have found small discrepancies, like the ones alleged in this case, to be immaterial as a matter of law. *See, e.g., Parnes*, 122 F.3d at 547 (A $6.8 million overstatement of assets "represented only 2% of [the defendant's] total assets. It

---

[3] Plaintiff states in its Response that Simon and Roll provided additional false financial documents to Plaintiff during the "due diligence" phase of the sale—that is, prior to the signing of the Merger Agreement. (Pl.'s Resp. at 47). But beyond the vague allegation that "[t]he Simon Directors, including Brian Simon and Roll, had even greater control over the facts disclosed to [Plaintiff] during due diligence," (Compl. ¶ 54), there is no allegation in the complaint that Simon or Roll gave Plaintiff false financial statements during the due diligence phase.

[4] *See* Compl. ¶ 71 (stating that USM's $142 million in net sales to AAM constituted 47% of USM's total net sales).

seems clear that a reasonable investor . . . would not have been put off by an asset column that was 2% smaller."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 631 (S.D.N.Y. 2005); *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at *8 (N.D. Ill. Nov. 14, 2000) ("Undisclosed expenses of $40 million . . . amount to nothing more than pocket change when compared with [the defendant's] overall sales expenses—less than 1% of the total."). It is true that even relatively small financial errors *can* be material. *See* SEC Staff Accounting Bulletin No. 99 (Aug. 12, 1999) (recognizing a 5% rule of thumb for assessing the materiality of accounting discrepancies, but also explaining that qualitative factors may make discrepancies of less than 5% material). But Plaintiff has not pleaded any qualitative facts that render plausible its assertion that the financial errors were material. In particular, there is no evidence of intentional conduct on the part of Simon or Roll or evidence that the "misstatement[s] change[d] a loss into income." *Id.*[5] Therefore, Plaintiff's allegations, as a matter of law, are insufficient to show a substantial likelihood that a reasonable

_____

[5] Plaintiff argues in its response that "[b]ecause USM's purchase price was based on a multiple of 6.5 times USM's earnings, the[] [financial discrepancies] materially affected how [Plaintiff] valued USM . . . ." (Pl.'s Resp. at 50-51). This 6.5 multiplier does not appear in the complaint. Moreover, although the complaint states that the alleged financial inaccuracies "reduced USM's earnings by nearly $2.2 million," the complaint fails to state in what year USM's earnings were reduced (or whether the earnings were reduced over a period of years). (Compl. ¶ 141). Thus, it is not possible to assess the impact of the supposed multiplier.

Plaintiff also notes that there is language in the Merger Agreement suggesting that Plaintiff found amounts as small as $50,000 to be material. (*See* Pl.'s Resp. at 43 (citing Merger Agreement §§ 2.9(c)-(d), 2.16, 2.19(a)(iv), (v), (x), 2.24, 2.27)). But these are just the amounts that Plaintiff thought material for the purpose of any future contractual dispute—this conception of materiality is completely distinct from the materiality element of a securities-fraud claim. Moreover, given that the materiality inquiry in a securities-fraud claim is objective, Plaintiff's subjective views are not relevant.

investor would view such discrepancies as *significantly* altering the total mix of information.

Second, Plaintiff has failed to plead facts giving rise to a strong inference of scienter.  A failure to follow GAAP is not *per se* securities fraud.  *See Yadlosky v. Grant Thornton, L.L.P.*, 120 F. Supp. 2d 622, 626 (E.D. Mich. 2000).  An inference of scienter will generally not be strong unless the plaintiff alleges "accounting violations that are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant."  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004).  Here, the individual accounting errors are relatively small, and given that Plaintiff has pleaded *no details* about the alleged accounting errors beyond the facts summarized above, it cannot reasonably be inferred that the errors were basic or pervasive in nature.  *See Rosenberg v. Gould*, 554 F.3d 962, 966 (11th Cir. 2009) (holding that an error that involved "only 0.5 percent of revenue in 2004 and 0.17 percent of revenue in 2005" was "de minimis" and did "not amount to a glaring 'red flag' that would have put [the defendant] on notice that he was overstating earnings").  Therefore, the alleged irregularities do not give rise to a strong inference of recklessness or knowledge on the part of Simon or Roll.[6]

_____

[6] Admittedly, Simon and Roll were designated as "Knowledge" parties in the Merger Agreement.  (*See* Compl. ¶ 56).  But most of the representations in the Merger Agreement about USM's finances were *not* asserted to be based on the "Knowledge" of the company; thus, the knowledge-party provision has limited application here.
 Moreover, where the knowledge-party provision applies, it simply adds an additional guarantee that Simon and Roll have conducted a "due and diligent inquiry." (Merger Agreement App'x A).  But this additional guarantee is entirely superfluous and does not affect the scienter analysis.  The kind of reckless or knowing mental state required under section 10(b) will often involve a failure to conduct a due and diligent inquiry, but it also will require something more.  *See La. Sch. Emps.' Ret. Sys. v. Ernst*

### b.   Alleged Misrepresentations Concerning USM's Capital

Next, Plaintiff alleges that Simon and Roll misrepresented and omitted information about USM's manufacturing capital.  Many of the alleged misrepresentations were contained in the Merger Agreement.  Again, it will be assumed *arguendo* that these misrepresentations can be attributed to Simon and Roll.  The misrepresentations and omissions fall into two categories: (1) those relating to the state of USM's capital *at the time of sale* and (2) those relating to the *projected* expenditures needed to continue operating USM's business.

First, Plaintiff alleges that "[d]uring due diligence, Brian Simon and Roll . . . concealed the physical condition of certain manufacturing assets, machinery, and physical inventory that were not working properly or were not working at the levels Brian Simon and Roll had represented to [Plaintiff]."  (Compl. ¶ 130).  The Merger Agreement makes a number of representations about USM's assets.  It states that "the assets owned or leased by [USM] . . . are sufficient in order to conduct the Business[] as presently conducted by [USM]."  (Merger Agreement § 2.12; Compl. ¶ 133).  The Merger Agreement further states that "[t]he assets of [USM] (a) have been maintained and repaired in the Ordinary Course of Business, and (b) are in such condition and repair, reasonable wear and tear excepted, as is suitable for the purposes for which they are presently used by [USM]."  (Merger Agreement § 2.13; Compl. ¶ 133).  Finally, the Merger Agreement contained a representation that USM "has [not] failed to make

---

*& Young, LLP*, 622 F.3d 471, 478-79 (6th Cir. 2010) ("Recklessness sufficient to satisfy 10b-5 is 'a mental state apart from negligence and akin to conscious disregard.'") (quoting *Comshare*, 183 F.3d at 550)).

any material expenditures in connection with the normal maintenance, repair and replacement of the material assets used in connection with the operation of the Business." (Merger Agreement § 2.9(g); Compl. ¶ 133).

General allegations of misrepresentations concerning the state of USM's capital are insufficient under Rule 9(b) and the PSLRA. The complaint identifies with particularity only a single piece of equipment that was allegedly in disrepair: the "Rockford." (Compl. ¶ 130). Allegedly, Simon and Roll's concealment of the poor condition of the Rockford resulted in machine downtime and maintenance expenditures costing "hundreds of thousands of dollars." (*Id.*).

The Court finds the alleged misrepresentations and omissions concerning the Rockford machine immaterial as a matter of law, for the same reasons discussed in the section above concerning the financial misrepresentations. The costs resulting from the Rockford problems constitute less than 0.4% of USM's $270 million purchase price.[7] Moreover, Plaintiff has failed to plead with specificity, as required by Rule 9(b) and the PSLRA, that there even *was* a misrepresentation concerning the Rockford. There are no apparent misrepresentations concerning the Rockford in the Merger Agreement. The Merger Agreement makes representations about the status of USM's equipment in general terms, but it does not make a representation that *all* of USM's equipment was in perfect condition. Finally, Plaintiff has failed to plead with particularity any facts showing that Simon and Roll made reckless or knowing misrepresentations or omissions

_____

[7] In its response and at the hearing, Plaintiff stated that the Rockford was a particularly critical piece of equipment. This may be true, but it does not negate the fact that the Rockford problems resulted in only minimal costs.

concerning the Rockford.  Plaintiff has pleaded no facts showing that Simon and Roll knew or should have known that the Rockford was in disrepair or that their general statements in the Merger Agreement were false in light of the Rockford's condition.  In sum, the allegations concerning the state of USM's capital at the time of the sale are not actionable.

Next, Plaintiff alleges that Simon and Roll misrepresented the future capital expenditures that would be required to "meet the capacity requirements" for three important "programs."  (Compl. ¶ 127).  Allegedly, Simon and Roll "knew from internal analyses" that some $18 million in capital expenditures would be required for these three programs.  (*Id.* ¶ 128).  Plaintiff claims that "[i]n both the March 2014 Management Presentation and in response to follow-up due diligence requests, Brian Simon and Roll represented . . . that these programs only required capital expenditures of $8.6 million, almost $10 million less than what was actually required."  (*Id.* ¶ 129).  Simon allegedly "authorized work orders for capital expenditures . . . in excess of the $8.6 million" prior to closing.  (*Id.*).

Plaintiff's allegations fail to satisfy the heightened pleading burdens of Rule 9(b) and the PSLRA.  First, Plaintiff has not pleaded the details of the misrepresentation or omission with particularity.  Plaintiff has disclaimed reliance on the Management Presentation.  The Management Presentation is the only specifically identified source for the $8.6 million capital expenditure amount forecast.  Plaintiff claims generally that Simon and Roll, at some point during due diligence, also forecasted a capital expenditure of $8.6 million, but such a general allegation lacks the "who, what, when, where, how" facts necessary under Rule 9(b).  *Bondali v. Yum! Brands, Inc.*, 620 F.

-17-

App'x 483, 488-89 (6th Cir. 2015).[8]  Furthermore, the various representations in the

Merger Agreement concerning USM's assets are all backward-looking.  (*See, e.g.*,

Merger Agreement § 2.12).  Thus, they do not apply to future capital expenditures.

Second, with regard to Roll specifically, Plaintiff has failed to plead scienter with

particularity.  A prediction of future capital expenditures involves soft information and

falls within the PSLRA's safe harbor for forward-looking statements, and therefore

Plaintiff must plead facts that give rise to a strong inference that Simon and Roll had

*actual knowledge* that the prediction was false.  The allegation that Simon authorized

work orders for capital expenditures in excess of the $8.6 million is perhaps sufficient to

give rise to a strong inference of actual knowledge on his part.  But the vague allegation

that Simon and Roll "knew from internal analyses" of the need for $18 million in

investment is insufficient to give rise to a strong inference of knowledge on Roll's part.

Even assuming that Roll read the supposed analyses, Plaintiff has not alleged facts

indicating that Roll should or would have taken the analyses seriously or realized their

import.  *Cf. In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 972 (S.D.

---

[8] It is noteworthy, although not material in the Court's analysis, that Plaintiff's claim that the Management Presentation forecasted only $8.6 million in capital investments is directly contradicted by the Management Presentation itself.  The Management Presentation forecasted that in 2014, USM would have to invest an estimated $8.6 million in the P558 program, just *one* of the three key programs. (Management Presentation at 64).  The Management Presentation forecasted that, in total, USM would have to make $45.5 million in growth-capital expenditures and $21.1 million in maintenance-capital expenditures from 2014-2017.  (*Id.*).  Given that the supposed representations by Simon and Roll during due diligence that $8.6 million would be sufficient for all three programs would have been blatantly inconsistent with the forecasts in the Management Presentation, it is quite implausible that Plaintiff would have relied on them.

Ohio 2009) (finding that "generalized allegations of . . . access to documents and internal information lack" the specificity required to establish scienter).

<strong>c.      Alleged Misrepresentations Concerning Dana</strong>

Dana is USM's second largest customer.  In 2013, Dana accounted for $106.9 million (35%) of USM's net sales.  (Compl. ¶ 72).  Consequently, Plaintiff and Sellers designated Dana (like AAM) as a "Significant Customer" in the Merger Agreement.  (*Id.* ¶¶ 69, 72).  Plaintiff alleges that Simon and Roll misrepresented and concealed material information about an alleged breach of contract involving Dana.  Plaintiff alleges that this breach led to a significant decline in USM's relationship with Dana.

Again, it will be assumed *arguendo* that the representations and omissions in the Merger Agreement can be attributed to Simon and Roll.  The Merger Agreement contained provisions (1) guaranteeing that USM did not have any undisclosed liabilities "that would be required to be disclosed on a consolidated balance sheet," (2) representing that USM's receivables were not "subject to any active counterclaim or setoff," and (3) representing that USM was not "in default in any material respect under any Material Contract, nor has any event or omission occurred that, through the passage of time or the giving of notice, or both, would constitute a default in any material respect."  (Merger Agreement §§ 2.8, 2.10, 2.19).  The contracts with Dana were "Material Contracts" under the Merger Agreement.  (Compl. ¶ 117).

The alleged breach of contract involved an agreement to supply certain "Axle Tube Assemblies" to Dana. (Compl. ¶ 116).  The agreement specified certain parts that USM was required to use, and USM was not allowed to deviate from specifications without written consent from Dana.  (*Id.* ¶¶ 116-17).  USM, however, "unilateral[ly]"

-19-

decided to substitute different parts, and Simon informed Dana of this decision in April 2014.  (*Id.* ¶ 118).  Roll was allegedly aware of the decision to substitute different parts, because he had received a memorandum.  (*Id.*).  Dana objected to the substitution, contending that "it 'was not disclosed early enough for Dana to respond' [and that it] 'forced [Dana] to proceed with fundamental changes in the product supplied to [its] customer.'" (*Id.* ¶ 119 (quoting Dana Letter) (third alteration in original)).[9]  "Dana characterized USM's conduct as 'active concealment' that violated well-established standards in the automotive industry, breached the Supply Agreement, breached USM's duty of good faith and fair dealing, and placed Dana at substantial risk of jeopardizing its current and future relationship with Ford." (*Id.* (quoting Dana Letter)).  Simon and Roll did not disclose the part-substitution breach to Plaintiff prior to closing.  (*Id.* ¶ 124).  Ultimately, Dana submitted "an obsolescence claim on February 27, 2015 in the amount of at least $428,396.71 arising from the alleged unauthorized changes." (*Id.* ¶ 125).

Plaintiff has failed to plead facts that could plausibly show that the alleged misrepresentation or omission was material.  Admittedly, the agreements with Dana were Material Contracts, and the alleged breach was fairly significant (involving possibly over $400,000), and therefore it appears that USM defaulted "in a[] material respect" under a Material Contract.  Thus, the representation in section 2.19 of the Merger Agreement was misleading or false, based on Plaintiff's allegations.  But this

---

[9] Defendants point out that the quotes from Dana in Plaintiff's complaint come from a November 7, 2014, letter, which was sent five months after the sale of USM closed.  (Defs.' Reply, Doc. 29, at 24).  Plaintiff, in quoting the letter in its complaint, appears to be alleging that Dana made materially similar *pre-closing* comments about the breach to Simon and Roll.

misrepresentation was not material within the meaning of federal securities law.[10]  The Dana breach involved around $400,000 in damages, less than 0.4% of USM's $106.9 million in annual sales to Dana and less than 0.2% of the $270 million sale price of USM.  As a matter of law, there is not a substantial likelihood that a reasonable investor would have viewed this small amount as significantly altering the mix of information available.

Further, with respect to Roll, Plaintiff has failed to plead scienter with particularity. The existence of a breach of contract is a matter of soft information, *see Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 574 (6th Cir. 2008), and therefore Plaintiff must plead facts giving rise to a strong inference of knowing misrepresentation or omission.  Roll allegedly received a memorandum concerning the Dana breach, but the complaint does not describe its contents or state that Roll even read it.  Therefore, there are no facts that render the inference of actual knowledge at least as compelling as the alternatives—the most likely alternative obviously being negligence or inadvertence.

Plaintiff also indicates in its complaint that concomitant with Simon and Roll's alleged misrepresentation about the breach of contract, there was a misrepresentation or omission about USM's declining relationship with Dana.  The complaint alleges that the above-described breach "threatened USM's relationship with Dana and . . . jeopardized multimillion-dollar contracts with Dana."  (Compl. ¶ 121).  Although Plaintiff has apparently abandoned this argument (Plaintiff does not expressly assert it in its

---

[10] This assertion is not inconsistent with the preceding two sentences.  The terms "material" and "Material Contract" in the Merger Agreement are distinct from the materiality element of a securities-fraud claim.  *See supra* note 5.

response), it could be argued that the failure to disclose the breach rendered false the Merger Agreement's representation that USM "has no Knowledge of[] any intention of a Significant Customer [such as Dana] . . . to limit or alter its business relationship with [USM] in any material respect."  (Merger Agreement § 2.20; *see* Compl. ¶ 73).  This argument is without merit.  First, Plaintiff has not alleged facts that render plausible its claim that this representation of soft information was false.  The only evidence is a stern letter sent by Dana months after the closing, which expresses Dana's displeasure with USM but not an intention to alter their relationship.  (*See* Dana Letter).  Second, given that the representation involved soft information, Plaintiff must plead specific facts that give rise to a strong inference that Simon and Roll actually *knew* that Dana intended to alter its relationship with USM.  Such facts are completely lacking in Plaintiff's complaint.

### d.    Alleged Misrepresentations Concerning AAM

AAM is USM's largest customer.  In 2013, AAM accounted for $142 million (47%) of USM's net sales, (Compl. ¶¶ 70-71), and Plaintiff and Sellers designated AAM as a "Significant Customer" in the Merger Agreement, (*id.* ¶¶ 69-70).  Plaintiff alleges that Simon and Roll misrepresented and concealed material information about disputes between USM and AAM, various claims that AAM had against USM, and USM's negotiations with AAM for a long-term agreement ("LTA").

First, Plaintiff claims that Simon and Roll misrepresented and concealed information concerning disputes that AAM had with USM.  Plaintiff alleges that in early 2014 AAM was unhappy with USM because USM had "unilaterally sought millions of dollars" in allegedly unjustified surcharges from AAM, (Compl. ¶¶ 79, 100-01), and

because USM had "unilaterally increas[ed] prices as much as 70% for certain parts," (*id.* ¶ 102). AAM expressed displeasure with both of these actions by USM and stated that it accepted the increased part prices "under duress." (*Id.* ¶¶ 101-02). This evidence of AAM's discontent was not disclosed to Plaintiff prior to closing. As noted above, there is a representation in the Merger Agreement that USM "has no Knowledge of[] any intention of a Significant Customer [such as AAM] . . . to limit or alter its business relationship with [USM] in any material respect." (Merger Agreement § 2.20; *see* Compl. ¶ 73). Again, the Court assumes *arguendo* that this representation may be attributed to Simon and Roll.

These allegations fail to state a claim of federal securities fraud. Putting aside the question whether the alleged facts even establish a material misrepresentation or omission, Plaintiff has clearly failed to plead scienter with particularity. AAM's intentions are a matter of soft information, and therefore Plaintiff is required to plead facts that give rise to a strong inference that Simon and Roll made knowing misrepresentations or omissions. Based on the alleged facts, Simon and Roll likely knew that AAM was displeased with some of USM's actions. But more likely than not, Simon and Roll did not infer from AAM's displeasure that AAM intended to change its relationship with USM. Thus, Simon and Roll probably did not think that AAM's expressions of displeasure undermined their representation about the intentions of "Significant Customer[s]."

Next, Plaintiff claims that Simon and Roll misrepresented and omitted information about various claims that AAM had against USM. The Merger Agreement contained representations that "[t]here [were] no liabilities . . . that would be required to be

-23-

disclosed," that USM's receivables were not "subject to any active counterclaim or setoff," and that USM was not "in default in any material respect under any Material Contract, nor has any event or omission occurred that, through the passage of time or the giving of notice, or both, would constitute a default in any material respect." (*Id.* §§ 2.8, 2.10, 2.19). In December 2013, AAM began pursuing "cost recoveries from USM for quality and other issues totaling over $3 million." (Compl. ¶ 104). AAM sent written communications detailing the price recoveries, although Plaintiff did not plead any facts indicating that these written communications included the $3 million amount. (*See id.* ¶¶ 92, 96). USM did not disclose to Plaintiff that AAM was seeking these cost recoveries. Ultimately, Plaintiff ended up paying $1.35 million to AAM to settle the cost recovery claims. (*Id.* ¶ 106). The complaint does not specifically state that these cost-recovery claims resulted from breaches of contract by USM. (*See id.* ¶ 104).

Plaintiff has failed to plead with particularity a material misrepresentation or omission. The alleged cost-recovery claims could *potentially* have fallen within any of the three sections from the Merger Agreement quoted above, but Plaintiff does not connect the dots in its complaint. Plaintiff does not specifically claim that USM would have had to disclose the claims on a consolidated balance sheet, that these claims constituted active counterclaims or setoffs against USM's receivables, or that these claims resulted from the breach of any "Material Contract," as that term is defined in the Merger Agreement.

Furthermore, Plaintiff has failed to plead scienter with particularity. Given that the representations in the Merger Agreement concerning breaches and counterclaims are matters of soft information or opinion, Plaintiff is required to plead facts giving rise to

-24-

a strong inference of actual knowledge.  But Plaintiff has not pleaded any facts from which the Court could infer that Simon and Roll knew that the cost recoveries fell within the clauses of the Merger Agreement quoted above.   In sum, Plaintiff's allegations concerning the cost recoveries fail to state a claim of securities fraud.

Finally, Plaintiff claims that Simon and Roll misrepresented and concealed information about USM's negotiations with AAM for an LTA.  For some time prior to the sale of USM to Plaintiff, USM and AAM had not had an LTA and had operated on monthly purchase orders.  (Compl. ¶ 102).  In the months leading up to the sale, USM had been trying to negotiate an LTA with AAM.

According to Plaintiff, these negotiations had not been going well and Simon and Roll concealed that this was the case.  AAM had informed USM that it intended to transition some of its purchasing to another supplier, and AAM had threatened that it would not retain USM as a supplier at all unless USM provided certain price reductions. (*See id.* ¶¶ 81, 91-92, 94-96).  AAM sent a proposed LTA to USM in March 2014 that included price reductions, AAM's transferring of certain purchases to another supplier, and a "$1 million cost recovery payment from USM to AAM."  (*Id.* ¶ 92).  An internal analysis prepared by USM showed that AAM's proposed changes to their relationship would result in USM's earnings being reduced by $25.5 million over five years.  (*Id.* ¶ 85).  AAM made another LTA offer in June 2014, shortly before closing, that "demanded the re-sourcing of key parts and price downs as high as 5% on others."  (*Id.* ¶ 94).  An internal analysis sent by a USM vice president to Simon and Roll suggested that the June 2014 proposed LTA would result in a $31.7 million reduction in earnings.  (*Id.* ¶ 95).

Plaintiff "repeatedly requested a copy of the negotiated LTA . . . during due diligence," but neither AAM's proposed LTAs nor the internal analyses were disclosed to Plaintiff.   (Compl. ¶ 90).  Furthermore, "the material and sales data that Brian Simon and Roll, on behalf of USM, provided to [Plaintiff] in the due diligence data room reflected no AAM price downs in 2014 and 2015."  (*Id.* ¶ 85).  Plaintiff also alleges in its complaint that

> [o]n the pre-transaction due diligence log, USM management, through counsel, responded [to Plaintiff's request for a copy of the proposed LTA] that "[t]he LTA as reflected in the budget, i.e.: price downs beginning in 2016" could be signed with AAM at any point and that USM was working to improve the terms of the LTA "such as the removal of price downs which would be upside to the current budget."

(*Id.* ¶ 90).  Even after Plaintiff acquired USM, Simon and Roll (who remained officers of the company) suppressed negative estimates about USM's future relationship with AAM.  (*See id.* ¶ 113).  In particular, they excised a slide stating that there would be a "negative cash flow impact of $15,000,000 per year and a negative EBITDA impact of $5,300,000 per year" from a presentation given to the post-sale board.  (*Id.*).

The statements made by "USM management" are not actionable—there is no indication that either Simon or Roll made these statements or any indication of when these statements were made.  Likewise, the "material and sales data that Brian Simon and Roll, on behalf of USM, provided to [Plaintiff] in the due diligence data room" are not actionable.  The allegation concerning these "data" lacks the particularity required by Rule 9(b) and the PSLRA—including the contents of the data, why they were misleading, and when the data were disclosed.  However, as noted above, there was a representation in the Merger Agreement that USM "has no Knowledge of[] any intention

-26-

of a Significant Customer . . . to limit or alter its business relationship with [USM] in any

material respect or to alter its payment terms with [USM] in any material respect."

(Merger Agreement § 2.20).  The representation is not as obviously unactionable as the

others.

      The representation in the Merger Agreement is a material misrepresentation.

Contrary to Defendants' arguments, the PSLRA safe harbor does not apply.  The

representation in the Merger Agreement about the Significant Companies' intentions

was not a "forward-looking" forecast or prediction.  It was a statement about USM's

knowledge of the *present* intentions of the Significant Companies, including AAM, not a

prediction of whether AAM or any other Significant Company would act on such an

intention.

      The representation in the Merger Agreement is a statement of soft information or

opinion, rather than a statement of objective fact.  But even to the extent that the

representation states an opinion, the representation is at least misleading.  The

hypotheticals in *Omnicare II* are instructive:

> Consider an unadorned statement of opinion about legal compliance: "We
> believe our conduct is lawful."  If the issuer makes that statement without
> having consulted a lawyer, it could be misleadingly incomplete.   In the
> context of the securities market, an investor, though recognizing that legal
> opinions can prove wrong in the end, still likely expects such an assertion to
> rest on some meaningful legal inquiry . . . .  Similarly, if the issuer made the
> statement in the face of its lawyers' contrary advice, or with knowledge that
> the Federal Government was taking the opposite view, the investor again has
> cause to complain . . . .
>
>    . . . Suppose, for example, that in stating an opinion about legal
> compliance, the issuer did not disclose that a single junior attorney expressed
> doubts about a practice's legality, when six of his more senior colleagues
> gave a stamp of approval.  That omission would not make the statement of
> opinion misleading, even if the minority position ultimately proved correct . .
> . .

135 S. Ct. at 1328-29 (footnote omitted).  Simon and Roll's representation in the Merger Agreement that they had no knowledge of any intention by AAM to materially alter its business relationship with USM is like the hypothetical statement of legal compliance made in the face of overwhelming contrary advice by legal counsel.  Based on the allegations in the complaint, it is plausible that Simon and Roll did not merely offer an opinion based on a conflicting set of facts, but rather offered an opinion contrary to *all* of the facts presented to them.[11]

Moreover, the misleading representation about AAM's intentions appears to be material.  AAM was USM's biggest customer and was responsible for 47% of USM's sales.  Thus, a reasonable investor would have found information that AAM intended to move some of its purchasing to another supplier and intended to receive price reductions to be significant.  *See Wallace v. IntraLinks*, No. 11-8861, 2013 WL 1907685, at *7 (S.D.N.Y. May 8, 2013) ("[T]he failure to disclose the impending loss of a major customer can render optimistic statements about [a] company misleading."); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1124 (W.D. Mich. 1996) (finding a material omission where defendant failed to disclose "the declining purchases by main retail customers").  Also, Plaintiff alleges that AAM's

---

[11] Defendants cite the complaint's allegation that "[i]n its Confidential Information Memorandum, USM [represented that it had] 'sole-supplier status across most of the products it supplie[d] . . . .'" (Compl. ¶ 88 (quoting Confidential Information Memorandum at 10)).  Defendants infer from this that AAM was "virtually [a] captive customer with no place else to go for USM's products."  (Defs.' Mot. Dismiss at 25).  Thus, Defendants argue that there was a basis for Simon and Roll to conclude that AAM's threats were hollow.  The problem with Defendants' argument is that Plaintiff contests the accuracy of the "sole-supplier" representation—according to Plaintiff, this representation was fraudulent.

-28-

proposed changes would have resulted in earnings losses of over $30 million over five years.  Unlike the immaterial amounts discussed in the sections above, a reasonable investor could view an earnings reduction of $6 million per year to be significant, in light of USM's income set forth in the Schedules.[12]

Plaintiff has also successfully pleaded facts giving rise to a strong inference that Simon and Roll acted with scienter when they made their misleading representation about AAM's intentions.  Simon and Roll both received memoranda evaluating the likely negative financial consequences of AAM's proposals.  This, alone, would probably be insufficient.  But Simon and Roll continued to conceal the negative consequences of AAM's proposals after closing, excising negative facts from a presentation given to the post-closing board.[13]  Moreover, based on the alleged facts, Simon and Roll had a strong motive to present an inaccurate picture of USM's relationship with AAM—Plaintiff alleges in its Complaint that Simon and Roll received sale bonuses, and Simon's bonus, at least, was tied to the sale price.  (*See* Compl. ¶¶ 48-49).  Although "the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter," *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 551 (6th Cir. 1999),

---

[12] Schedule 2.7(a) contains a financial statement that states that USM's net income in 2013 was approximately $19 million and gross income (before taxes and operating expenses are subtracted) was approximately $40 million.

[13] Defendants point out that in this circumstance, Simon and Roll hid information from the board, not from Plaintiff.  This alleged act of concealment is still highly probative, however.  It tends to show that Simon and Roll tried to hide the information about AAM's proposal from everyone, not just Plaintiff.

Plaintiff's allegations go far beyond this. Thus, a reasonable person would likely conclude that Simon and Roll acted knowingly.[14]

Ultimately, however, the representation in the Merger Agreement about AAM's intentions is not actionable. The parties do not argue in any detail the pleading standard for the loss-causation element, so the Court will assume that Rule 9(b) and the PSLRA do not impose heightened pleading requirements for loss causation. *See Dura Pharm*, 544 U.S. at 346 ("[W]e assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirements in respect to the pleading of proximate causation."); *but see Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) ("We review allegations of loss causation for 'sufficient specificity' . . . ."). Even under the Rule 8 standard, Plaintiff's allegations are insufficient to render plausible Plaintiff's claim that it suffered a loss as a result of Simon and Roll's alleged fraud. Plaintiff alleges that shortly after closing, "USM revealed to [Plaintiff] for the first time that AAM planned 'to begin resourcing activities and [to] reduce dependency on USM,' [and that] . . . 'AAM is no longer engaging USM up-front.'" (Compl. ¶ 112). The complaint also contains other allegations that AAM voiced concerns to Plaintiff about USM after USM's sale and that AAM made statements

---

[14] Defendants argue that, as a matter of "common sense," Simon and Roll could not have had scienter. (Mot. Dismiss at 67). Defendants claim that "[i]n essence Plaintiff suggests that [Roll and Simon] set out to commit a fraud that inevitably would be discovered either immediately upon closing or during Plaintiff's very first conversation with AAM—yet did so while expecting to continue working for USM and earning substantial compensation." (*Id.*). But Simon and Roll might not have realized that they would get caught, or they might have thought that the consequences of being caught would not outweigh the benefits that they expected to receive through their alleged fraud.

indicating a desire to shift to other suppliers. (*See id.* ¶¶ 107-14). But Plaintiff has not alleged any facts indicating that AAM ever acted on its stated intention to shift to another supplier, that AAM ever extracted substantial price concessions from Plaintiff, or that Plaintiff was ultimately forced to agree to an unfavorable LTA with AAM. These deficiencies are particularly glaring given that the deal with USM closed over two years ago.

### 3. Conclusion

Because none of Plaintiff's stated theories[15] for liability under Count 1 states a securities fraud claim, the Court will dismiss Count 1.

### C. Count 2 – Section 20(a) of the Securities Exchange Act (Controlling-Person Liability)

In Count 2, Plaintiff alleges that the four Simon Directors and the six Voting Shareholders are secondarily liable for Simon and Roll's conduct in Count 1, because they were "controlling persons" under section 20(a) of the Securities Exchange Act. *See* 15 U.S.C. § 78t(a). In order to make out a claim under section 20(a), a plaintiff must establish an underlying violation of the Securities Exchange Act and establish that the defendant controlled the violator. *See id.* The Sixth Circuit has adopted a two-prong test for control: (1) "the defendant . . . actually participated in (i.e., exercised control over) the operations of the [violator] in general," and (2) "the defendant

---

[15] Plaintiff asserts in its response that there was also an actionable misrepresentation in the "Material Adverse Effect" section of the Merger Agreement. (Pl.'s Resp. at 51; Merger Agreement § 2.9(a)). But this argument is not supported by the complaint, which does not mention the Material Adverse Effect section in connection with Count 1, let alone plead with particularity that there was a knowing material misrepresentation or omission in this section.

possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *Sanders Confectionary Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir. 1992) (citation and internal quotation marks omitted); *see also N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 788-89 (M.D. Tenn. 2013); *Gordon v. Elite Consulting Grp., L.L.C.*, No. 09-10772, 2010 WL 5390172, at *5 (E.D. Mich. Dec. 22, 2010).

There is a split of authority as to whether Rule 9(b) and the PSLRA apply to the control element.  Defendants cite *Bondali*, 620 F. App'x at 488, an unpublished case, for the proposition that a section 20(a) violation must be pleaded with particularity.  In that case, the Sixth Circuit did indeed state that "[b]ecause Section . . . 20(a) claims sound in fraud, this court must . . . impose the pleading requirements of Federal Rule of Civil Procedure 9(b)."  *Id.*  But the court did not actually address the control element in its analysis, but instead found that the plaintiff had failed to establish the underlying securities violation.  *See id.* at 493.  Furthermore, this Court believes that the most plausible interpretation of the quoted language is that the underlying securities fraud that supports the section 20(a) claim must be pleaded with particularity—not that the entire section 20(a) claim, including the control element, must be pleaded with particularity.  Therefore, the Court will not require Plaintiff to plead control with particularity.  *See N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 788-89 (M.D. Tenn. 2013) ("Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." (quoting *In re Nat'l Century Fin. Enters.*, No. 2:03-md-1565, 2006 WL 469468, at *23 (S.D. Ohio Feb. 27, 2006)) (internal quotation marks omitted)); *see also In re Stone & Webster, Inc.,*

*Sec. Litig.*, 414 F.3d 187, 201 (1st Cir. 2005) ("[T]he strong-inference requirement of the PSLRA does not apply.").

The Court finds that Plaintiff has failed to state a claim of controlling-person liability.  First, Plaintiff has failed to adequately plead a securities violation by Simon and Roll, as explained in the section above concerning Count 1.  Second, Plaintiff has failed to plead facts that render plausible its allegation that the Voting Shareholders and the Simon Directors controlled Simon and Roll.

The complaint makes a number of vague allegations to the effect that the Simon Directors and the Voting Shareholders were involved in reviewing and approving the Merger Agreement.  (*See* Compl. ¶¶ 47-48, 52, 54, 62).  The complaint also alleges that "[e]ach of the Simon Directors . . . and Voting Shareholders directly or indirectly controlled USM through his or her ongoing involvement and supervision of USM's business activities and/or ownership of 100% of the outstanding voting shares or USM." (*Id.* ¶ 35).  The complaint also alleges that "[t]he Simon Directors supervised Brian Simon and Roll in connection with financial reporting generally and the transaction with [Plaintiff] specifically.  The Simon Directors received regular reports and updates from USM officers and employees, including Brian Simon and Roll, provided instructions and general direction to Brian Simon and Roll, and had ultimate authority at USM."  (*Id.* ¶ 55).

Plaintiff's allegations are sufficient to satisfy the first prong of the control test: *general* involvement in the day to day operations of the company.  But these allegations say little about the Simon Directors' or the Voting Shareholders' power to exercise control over Simon and Roll relating to Simon and Roll's alleged misconduct.  The

-33-

allegations are largely "legal conclusions cloaked as fact" and thus are entitled to little or

no weight.  *Haddad v. Randall S. Miller Associates, PC*, 587 F. App'x 959, 963 (6th Cir.

2014).  To the extent that the conclusory allegations are entitled to any weight, they at

most show that the Simon Directors and the Voting Shareholders *collectively* had the

power to supervise Simon and Roll, not that any of the Simon Directors and Voting

Shareholders individually had the power to do so.  But this is insufficient as a matter of

law.  *See Rich v. Maidstone Fin., Inc.*, No. 98 CIV. 2569 (DAB), 2001 WL 286757, at *6

(S.D.N.Y. Mar. 23, 2001) ("A complaint may not simply 'clump[] defendants together in

vague allegations.'" (quoting *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1294 (S.D.N.Y.

1996)) (alteration in original)); *Durham v. Whitney Info. Network, Inc.*, No. 06-CV-00687,

2009 WL 3783375, at *17 (M.D. Fla. Nov. 10, 2009).   Plaintiff does not allege that the

Simon Directors or Voting Shareholders acted in concert.

    With respect to the Voting Shareholders, in particular, there is an additional

reason to hold that Plaintiff has failed to successfully plead control.  As Defendants

point out, the Schedules to the Merger Agreement establish that each Voting

Shareholder held less than 21% of USM's voting shares.  (*See* Schedule 2.6(b)).

Clearly, "a minority stock interest, without more, is insufficient to base an allegation of

control."  *Picard Chem.*, 940 F. Supp. at 1136.  Plaintiff cites *JAC Holding Enterprises,

Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 738 (E.D. Mich. 2014)

(Lawson, J.) for the proposition that even a minority stake in a company can be

sufficient evidence of control.  But the minority shareholders that were found to be

controlling persons in *JAC* all had other roles as well, such as being managing partners

of a partnership that owned a *controlling share* of the company's stock, and they also

-34-

"each instructed [the principal violators] in carrying out specific elements of the [fraudulent] plan." *Id.* Such facts are not present in the instant case.[16]

Therefore, the Court finds that Plaintiff has failed to state a claim under Count 2. The Court will dismiss Count 2 in its entirety.

### D.    Counts 3 and 4 – Michigan Uniform Securities Act

In Count 3, Plaintiff alleges that Simon and Roll violated the Michigan Uniform Securities Act ("MUSA"), Mich. Comp. Laws § 451.2101 *et seq.* The factual basis for Count 3 is identical to the basis for Count 1. The parties agree that "a securities claim under [the MUSA] is nearly identical to the corresponding federal securities fraud claim." *JAC Holding*, 997 F. Supp. 2d at 739 (quoting *The MJK Family LLC v. Corp. Eagle Mgmt. Servs., Inc.*, No. 09-12613, 2009 WL 4506418, at *4 (E.D. Mich. Nov. 30, 2009)) (internal quotation marks omitted). Because the Court found that Plaintiff has failed to state a claim in Count 1, the Court finds that Plaintiff has failed to state a claim in Count 3. The Court will dismiss Count 3.

In Count 4, Plaintiff asserts that the Simon Directors and the Voting Shareholders are secondarily liable under the MUSA for Simon and Roll's primary MUSA violations. Because there was no primary MUSA violation in Count 3, the Simon Directors and the

---

[16] The Court notes that Simon is a member of the Voting Shareholders and the Simon Directors. Plaintiff has not pleaded any facts that render a conclusion that Simon exercised control over Roll plausible. And presumably Simon cannot be held secondarily liable under section 20(a) for his own primary violation under section 10(b), although the parties do not address this possibility.

Voting Shareholders cannot be held secondarily liable.  Therefore, the Court will dismiss Count 4.[17]

### E.    Counts 5-11 – Common-Law Fraud and Misrepresentation Claims

In Counts 5 through 11, Plaintiff alleges various forms of common-law fraud: fraudulent inducement (Count 5), fraudulent misrepresentation (Count 6), concert of action as to fraud (Count 7), silent fraud (Count 8), concert of action as to silent fraud (Count 9), negligent misrepresentation (Count 10), and innocent misrepresentation (Count 11).  Counts 5 through 9 involve claims against Simon and Roll.  Counts 10 and 11 are claims against the Simon Directors, the Voting Shareholders, Simon, and Roll. The parties agree that Michigan law governs these claims.

These counts are all barred by the doctrine first set forth in *Hart v. Ludwig*, 347 Mich. 559, 79 N.W.2d 895 (1956).  Under the *Hart* doctrine, an action in tort can arise only out of a "violation of a legal duty separate and distinct from the contractual obligation" of the defendant.  *Rinaldo's Const. Corp. v. Michigan Bell Tel. Co.*, 454 Mich. 65, 84, 559 N.W.2d 647, 658 (1997); *see also Brock v. Consol. Biomedical Labs.*, 817

---

[17] The Court notes, however, that its second basis for dismissing Count 2 (Plaintiff's failure to plead control) does not fully apply to Count 4.  The MUSA, like the Securities Exchange Act, provides for secondary liability for controlling persons.  *See* Mich. Comp. Laws § 451.2509(7)(a).  But unlike the Securities Exchange Act, the MUSA also provides for secondary liability for "managing partner[s], executive officer[s], [and] director[s] of a [primary violator]."  *Id.* § 451.2509(7)(b).  Therefore, the Simon Directors could be held secondarily liable for Simon and Roll's primary MUSA violations. The Voting Shareholders (at least those Voting Shareholders who are not also Simon Directors), however, do not fall within this provision.  Thus, they could not be held secondarily liable for Simon and Roll's primary violations.  At any rate, since there was no primary violation by Simon and Roll, neither the Simon Directors nor the Voting Shareholders can be held liable secondarily.

-36-

F.2d 24 (6th Cir. 1987); *Hart*, 347 Mich. at 565 ("[I]f a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not."  (quoting William Prosser, *Handbook of the Law of Torts* § 33 (1st ed.)) (internal quotation marks omitted)).

Plaintiff's complaint alleges misrepresentations and misleading omissions in the Confidential Information Memorandum and the Management Presentation; misrepresentations and omissions by Simon, Roll, and other unnamed managers during the due diligence phase of the sale; and misrepresentations and omissions  in the Merger Agreement.  Plaintiff has now disclaimed reliance on the Confidential Information Memorandum and the Management Presentation.  And as explained in the discussion above concerning Count 1, none of the alleged misrepresentations during the due diligence phase has been described with sufficient particularity under Rule 9(b). This leaves only the alleged misrepresentations in the Merger Agreement, as well as omissions of material fact that are actionable, if at all, only because they arise out of affirmative misleading representations in the Merger Agreement.  These representations and omissions fall squarely within the *Hart* doctrine.  *See Indus Concepts & Eng'g, LLC v. Superb Indus., Inc.*, No. 15-13150, 2016 WL 3913711, at *7-*8 (E.D. Mich. July 20, 2016) ("The danger of allowing contract law to drown in a sea of tort exists . . . where fraud and breach of contract claims are factually indistinguishable." (quoting *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 370, 532 N.W.2d 541 (1995)) (internal quotation marks omitted) (omission in original)); *Santander Consumer USA, Inc. v. Superior Pontiac Buick GMC, Inc.*, No. 10-13181, 2013 WL

-37-

27921, at *11 (E.D. Mich. Jan. 2, 2013); *PHD Michigan, L.L.C. v. Outfitters Ass'n of Am.*, No. 04-73964, 2006 WL 2042515, at *7 (E.D. Mich. July 20, 2006).

Plaintiff argues that "[w]here a plaintiff alleges that fraud and misrepresentation took place before the parties entered into a contract, the defendant's legal duty not to misrepresent or to fraudulently induce plaintiff to enter into the contract does not arise out of any contractual duties between the parties." (Pl.'s Resp. at 75). But, as noted above, Plaintiff has not pleaded with particularity any pre-Merger Agreement misrepresentations. Plaintiff, citing *United States Fidelity and Guaranty Co. v. Black*, 412 Mich. 99, 313 N.W.2d 77 (1981), also argues that "under Michigan law, parties negotiating a business transaction have [an independent] common-law duty to disclose any information that renders prior representations misleading or untrue before the transaction closes." (*Id.*). The *Fidelity* case, however, involved misrepresentations extraneous to a contract. 412 Mich. at 127. Specifically, agents for the plaintiff incorrectly told the defendant that certain bond requirements had been satisfied, in order to induce the defendant to enter an indemnity agreement with the plaintiff. *See id.* Here, by contrast, the misrepresentations and misleading omissions are fully interwoven with the Merger Agreement.

Therefore, the Court will dismiss Counts 5 through 11.

### F.    Counts 12-16 – Breach of Contract Claims

Counts 12 through 16 assert claims against the Sellers for alleged breaches arising out of representations in the Merger Agreement concerning AAM (Count 12), Dana (Count 13), USM's capital (Count 14), and USM's finances (Count 15), as well as

-38-

an alleged breach of a "Material Adverse Effect" provision in the Merger Agreement (Count 16). The parties agree that Michigan law governs these claims.

The Court finds that Counts 12 through 16 all state claims upon which relief may be granted. "A party asserting a breach of contract must establish . . . that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 495 Mich. 161, 178, 848 N.W.2d 95 (2014). Defendants' argument concerning Counts 12 through 16 is nearly identical to their argument relating to Count 1 (securities fraud). The various allegations summarized in the discussion concerning Count 1 render plausible Plaintiff's claim that Sellers breached a number of the representations in the Merger Agreement.

It is admittedly true that, as explained in the discussion concerning Count 1, the alleged misrepresentations in the Merger Agreement fall short of securities fraud—because the misrepresentations were not material within the meaning of securities law, because Plaintiff failed to demonstrate scienter, or because Plaintiff failed to comply with the pleading requirements of Rule 9(b) and the PSLRA. But the standards for a breach of contract claim are different. Materiality within the meaning of the Merger Agreement is different from materiality within the meaning of securities law. Furthermore, there is no scienter element of breach of contract claim. Finally, Counts 12 through 16 are not fraud or securities claims, and therefore the heightened pleading requirements of Rule 9(b) and the PSLRA do not apply.

Therefore, the Court will not dismiss Counts 12 through 16.

-39-

**IV. CONCLUSION**

For the reasons explained above, the Court DISMISSES Counts 1 through 11. The Court will NOT DISMISS Counts 12 through 16.  Pursuant to Rule 15(a)(2), the Court will allow Plaintiff to amend its complaint.  If Plaintiff wishes to amend its complaint, it SHALL FILE an amended complaint within TWENTY-ONE DAYS of the entry of this opinion and order.

Further, the Court notes that it has dismissed both of Plaintiff's federal claims and that there is not diversity between Plaintiff and Defendants.  If Plaintiff fails to file an amended complaint that successfully states at least one federal claim, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over Plaintiff's state claims and will dismiss those claims without prejudice.  *See* 28 U.S.C. § 1367(c)(3).

IT IS SO ORDERED.

Dated:  August 18, 2016

s/George Caram Steeh<br>
GEORGE CARAM STEEH<br>
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on August 18, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---